UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

ALI MOALAWI

Plaintiff,

-AGAINST-

THE CITY of NEW YORK,

DETECTIVE STEVEN STANLEY,
individually and as a
member of the NYPD,
DETECTIVE ALBERT VELEZ,
individually and as a
member of the NYPD,
and
UNKNOWN "JOHN DOE" MEMBERS OF THE
NEW YORK CITY
POLICE DEPARTMENT AND THE
NYPD COUNTERTERRORISM
BUREAU,
individually and as a
members of the NYPD,
Defendants.

COMPLAINT

JURY TRIAL
DEMANDED

DOCKET:

Plaintiff, Ali Moalawi, *Pro Se*, respectfully alleges by personal knowledge and upon information and belief, as follows:

1

## NATURE OF THE ACTION

1. This is a civil action, pursuant to 42 U.S.C. §§1983 and 1988, seeking monetary damages for Plaintiff, Ali Moalawi, because he spent nearly two years wrongfully incarcerated based upon burglary charges fabricated by the New York City Police Department and selective prosecution by the state prosecutors and members of the New York City Police Department in violation of his federal rights pursuant to the First and Fourteenth Amendments to the United States Constitution.

2. Plaintiff's damages also resulted from the failures of police officers and prosecutors to adhere to their obligations pursuant to *Napue v. Illinois*[1] and *Brady v. Maryland*[2] by the furnishing and making use of known false statements to aid and advance the prosecution's case and the state prosecutors' refusal to correct and/or remediate known false testimony offered by police witnesses during the hearings and trial of the criminal prosecution. The *Napue* violations continue to this day.

3. The City of New York is liable to Plaintiff for damages caused by the *Brady* and *Napue* violations and the damages caused by the selective prosecution of the Plaintiff because of his religious affiliation, national origin, and ethnicity. The City of New York is liable for the aforesaid violations

---
[1] *Napue v. Illinois*, 360 U.S. 264, 269-272 (1959).
[2] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

because they resulted from the unlawful and/or deliberately indifferent policies of the New York City Police Department ("NYPD") and the New York County District Attorney's Office ("DANY" or Manhattan DA Office") that impacted the Plaintiff.

## RELEVANT PROCEDURAL HISTORY OF THE CASE

4. Plaintiff was indicted for seven counts of burglary beginning at the end of 2014 and prior to his 2017 trial. He was accused of assisting a principal, Ricky Moore, with the commission of a series of Manhattan burglaries during a five-month period of time. The New York County District Attorney's Office contended that Plaintiff's primary role was as Mr. Moore's get-away driver.

5. Ricky Moore was indicted as a co-defendant with Plaintiff. Plaintiff's case with Ricky Moore was severed post-indictment and prior to the Plaintiff's trial.  The two men were tried separately.

6. Plaintiff's trial began November 8, 2017.  The trial was completed by November 17, 2017.

7. Plaintiff was convicted of two of the seven counts of burglary he was tried for before the Honorable Ruth Pickholz of the New York County Supreme Court.  A verdict was taken on November 17, 2017.

3

8. Plaintiff was convicted of second-degree burglary for acting as Mr. Moore's accomplice in an alleged burglary that took place at 41 West 54th Street. The jury also convicted the Plaintiff of a third-degree burglary as Mr. Moore's accomplice that allegedly took place at 9 East 45 Street.

9. The jury deliberated for at least three days before reaching a verdict. Of the seven counts the jury considered during the trial the Plaintiff was acquitted of three charges and convicted of two. The jury did not reach a verdict on two of the charges and the state never retried Plaintiff for these charges.

10. Ricky Moore was tried for several of the same charges the Plaintiff was charged with before a jury and the Honorable Robert Mandelbaum in February 2019.

11. On February 14, 2019, prior to jury deliberations, Justice Mandelbaum dismissed against Mr. Moore, as the principal, a charge based upon the very same facts the third-degree burglary charge the Plaintiff was convicted of.

12. Justice Mandelbaum dismissed the case because he determined that the same evidence used to convict the Plaintiff as an accessory to the third-degree burglary charge was insufficient as a matter of law to convict Mr. Moore as the principal actor of the alleged burglary.

4

13. On February 20, 2019 Ricky Moore's jury acquitted him, as the principal, on the same facts as the second-degree burglary the Plaintiff was convicted of as an accessory after the Moore jurors considered these same facts.

14. The Plaintiff appealed the trial court judgment to the New York State intermediate court of appeals. The Appellate Division: First Department affirmed the determination and judgment of the trial court on June 17, 2021.

15. The Court of Appeals of the State of New York denied Plaintiff leave to appeal the June 17, 2021 decision by the Appellate Division: First Department on August 4, 2021.

16. Prior to the Court of Appeals of the State of New York decision to deny leave Plaintiff was released from parole supervision by the State of New York. Plaintiff was released from parole supervision by the State of New York on July 23, 2021.

17. Plaintiff was released from state custody a few weeks before the Court of Appeals of the State of New York denied him leave to appeal his judgment of conviction to that court. As of the July 23, 2021 date Plaintiff no longer was eligible for federal habeas corpus relief.

18. Plaintiff is entitled to and seeks a federal remedy in this court for the defendants' violations of his federal

constitutional rights and the defendants' violations of federal law.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

19. This action arises under 42 U.S.C. §§1983 and 1988.

20. Jurisdiction is conferred upon this court pursuant to 28 U.S.C. §§1331 and 1343.

21. Venue is proper in this court pursuant to 28 U.S.C. §1391, as the events giving rise to the claim occurred in New York County.

22. This action is timely because it was commenced within three years of the time Ali Moalawi's federal causes of action accrued.

23. Plaintiff has duly complied with all of the conditions precedent to the commencement of this action.

## THE PARTIES

24. Plaintiff, Ali Moalawi, is a United States citizen and resident of Suffolk County, New York.

25. Defendant City of New York, of which New York County is a sub-division, is a municipal corporation of the State of New York and is a resident of the Southern District of New

York.    The New York County District Attorney's Office and the New York City Police department are agencies of New York City.

26.    Defendant Detective Steven Stanley was at all relevant times a detective employed with the NYPD who was acting within the scope of his authority and under the color of state law during all of his interactions and involvement with matters concerning Ali Moalawi. He is named here in his individual and personal capacities.

27.    Defendant Detective Albert Velez was at all relevant times a detective employed with the NYPD who was acting within the scope of his authority and under the color of state law during all of his interactions and involvement with matters concerning Ali Moalawi. He is named here in his individual and personal capacities.

28.    Defendants who are unknown "John Doe" members of the NYPD or the NYPD Counterterrorism Unit were at all relevant times police officers, NYPD employees, or detectives employed with the NYPD who were acting within the scope of their authority and under the color of state law during all of their interactions and involvement with matters concerning Ali Moalawi. They are named here in their individual and personal capacities.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

29. Ali Moalawi at all times maintains that he is innocent of the burglary charges for which he was convicted. One of the primary reasons he brings this case is because federal habeas corpus relief was not available to him.

30. Plaintiff was born in Kuwait in 1976. He lived in Kuwait until 1988. Plaintiff's father was born in Iran but worked in Kuwait for many years as a long-distance truck driver. Plaintiff and his family were not wealthy. Plaintiff and his family struggled mightily while he lived in Kuwait. Plaintiff's childhood was very difficult because his father died suddenly when Plaintiff was three years old. His mother was about 18 when his father died. It was extremely difficult for Plaintiff's mother to support him and his younger siblings because his mother was Iranian and, because she was an Iranian, an outcast in Kuwait.

31. Plaintiff's widowed mother had to survive with young children in the shadow of the Iraq and Iranian war. His mother was Iranian but because of the war she was not able to travel to Iran to be with family. It was nearly impossible for her to find work because most people living in Kuwait despised the Iranians in their country and told them to go back to where they came from.

32. An older man took Plaintiff's 18 year-old mother with her children into his care. He was thirty-six years older than Plaintiff's mother but he was well off enough to take her and her young children in. Eventually Plaintiff's mother married this much older man.

33. Soon after the older man married Plaintiff's mother he began to abuse her. Eventually, he did not want Plaintiff's mother to have contact with people outside of his house. All he wanted her to do was stay home, cook, and serve him. Essentially, she became his slave. He would beat her savagely with belts and scar her if she refused his commands. Plaintiff saw this and remembers it.

34. Plaintiff's mother lived with this because she was a prisoner in the sense she had nowhere to go and had several young children to care for.

35. Plaintiff grew up in one small room with his siblings while he lived in Kuwait. He had very few toys.

36. Plaintiff moved to the United States when he was 12. His mother got a chance to visit the United States with her husband and once here, after seeing the possibilities, refused to return to the Middle East with her husband.

37.  Plaintiff was thirteen and his brother was eleven when they started working at various jobs in order to help support the family. Plaintiff went to junior high school and after junior high school regularly worked until ten o'clock in the evening. Plaintiff and his brother usually worked full days on Saturdays and Sundays. They worked in the neighborhood grocery store.  The work allowed for the family to pay rent, buy food, and maintain the utilities.

38.  When Plaintiff was fifteen he entered high school.  He also took a job at a shop where he had to live in the back of the shop, away from home, to keep the job.  Plaintiff would wake up at 6 am from a small room in the back of the shop, get dressed, and prepare the shop for morning business. Plaintiff was in school by 8:30 am to 3:00 pm and then left school to work in the shop.  He studied for school beginning at midnight. On Saturdays he worked twelve hours and on Sunday six hours.

39.  The shop Plaintiff worked in during high school was robbed at gun point while he was present.  Plaintiff changed jobs when another employee threated him with a gun after he survived the gun point robberies.

40.  Plaintiff took a variety of jobs after leaving the shop. He was an immigrant and lacked appropriate work papers for most jobs and so he took jobs as a delivery person and bus

boy.  He worked after school from 4 pm to 10 pm and then worked twelve hours on Saturdays and six hours on Sundays.

41. Plaintiff's mother finished her GED, entered college, and graduated from college with honors.  Inspired by his mother Plaintiff finished his associates degree and began to apply for professional jobs instead of restaurant work.  He soon would become a United States citizen.  Eventually he accepted a position with Xerox as a field service technician.  While working for Xerox Plaintiff continued college to finish his Bachelor of Science in Electromechanical Engineering.  He is a few credits short. He also earned certificates for a Certified Computer Technician and a Certified Microsoft Professional.

42. In 2000 a headhunter reached out to him and offered Plaintiff a better position with a company called Carl Zeiss.  Plaintiff was hired in September 2000 as a Field Service Engineer and grew with the company. He worked on optical microscopes and became one of the top engineers in his field. He trained many employees and was assigned to projects that involved new technologies.

43. The Plaintiff's work at Zeiss paid him very well and required travel to Germany for training.  Plaintiff also had to travel around the United States to visit government facilities and research laboratories as a part of his

employment with Zeiss. Plaintiff worked about fifteen years for Carl Zeiss.

44. By the year 2000 there were five family members of the Plaintiff who were working. The family pooled resources and were able to purchase homes and open businesses. Plaintiff's mother re-married in 1999 and had a daughter after her marriage. Plaintiff married and was blessed with a daughter in 2012.

45. The police state Plaintiff was arrested at the precinct on December 19, 2014 at 8 am. New York City Police detectives forced their way into Ali Moalawi's home near 6 am on that day.

46. Among the first things the NYPD detectives asked him was how he could afford such a beautiful home on his salary. The detectives also disparaged a Muslim prayer that adorns the vestibule of the home after they rushed inside.

47. The detectives told Ali Moalawi that he was not under arrest upon their entrance into his home. Ali Moalawi was not free to leave at any time after his encounters with the police on December 19, 2014.

48. The detectives handcuffed Ali Moalawi in his home in front of his family and then handcuffed him again in the police van used to transport him to Manhattan. Ali Moalawi was

handcuffed once he arrived at the precinct and handcuffed while he was in an interview room.

49. Detective Steven Stanley interviewed Ali Moalawi soon after he arrived at the precinct and asked him if he knew Ricky Moore or whether or not Mr. Moore was involved with burglaries.

50. Plaintiff conceded he knew Ricky Moore but he also told Detective Stanley he did not know of any burglaries and was unaware items Ricky Moore was carrying were stolen. Plaintiff never confessed to participating in burglaries or possessing or transporting stolen goods.

51. Plaintiff told the detectives on occasion he would give Ricky Moore a ride in his car as a component of their friendship.

52. Unknown to Plaintiff at the time of his arrest New York City police detectives and prosecutors had been investigating him for a series of burglaries in Manhattan for several months.

53. The New York City police detectives approached the Plaintiff's employer, Zeiss, a few months before his arrest. Both the police and the New York County District Attorneys Office falsely conveyed to Plaintiff's employer

that they had very strong evidence that Plaintiff was involved with the burglaries they were investigating.

54. The police and a Manhattan prosecutor falsely reported to Zeiss officials that Plaintiff confessed to the burglaries and that his role was transporting, receiving, and reselling stolen goods with the use of a Zeiss vehicle. The information the prosecutor passed to Zeiss officials was collected from false police reports to the prosecutors.

55. The false reports made by the state prosecutors and the police to Zeiss officials immediately ruined the Plaintiff's life. Plaintiff summarily was fired from his job by Zeiss because of the false reports the company received from the police and the Manhattan prosecutor.

56. The police and prosecutors also falsely informed Zeiss the Plaintiff misused a company vehicle in support of a business venture with another company. This false report in tandem with the reports of criminal behavior resulted in the Plaintiff's termination from employment with Zeiss.

57. On December 19, 2014 the police arrested Ali Moalawi without any evidence he was a principal or an accessory to a burglary or any other crimes.

58. There either was no evidence or insufficient evidence the principal, Ricky Moore, committed the two burglaries the

Plaintiff was convicted of and the police and state prosecutors were aware of the weakness of the cases against Mr. Moalawi before they arrested the Plaintiff.

59. None of the evidence the police or the state prosecutors amassed could demonstrate the Plaintiff's intent to act as an accessory for Mr. Moore. The police and prosecutors never had evidence of the Plaintiff's criminal intent, yet instead, they chose to try to ruin his life and take away his career to prove a case against him.

60. The police and prosecutors lacked evidence to show Mr. Moore entered a building he was accused of burglarizing and, notwithstanding, continue to sustain Mr. Moalawi's conviction for the same charge to this day.

61. One of the reasons the police and Manhattan prosecutors arrested and prosecuted the Plaintiff without evidence or with evidence so weak they knew it never could sustain a conviction for burglary was because of the Plaintiff's religious beliefs and national origin.

62. The detective in charge of the burglary investigations concerning the Plaintiff was Albert Velez. Detective Albert Velez called the Plaintiff a "camel jockey" and a "desert rat" during the arrest process at the precinct on the day of the arrest.

63. The police disparaged religious symbols in the Plaintiff's home during his arrest and insulted Plaintiff and his family with an ethnic slur by questioning how they could afford a nice home in Suffolk County.

64. The Plaintiff's criminal lawyer was told by a Manhattan prosecutor that one of the reasons Plaintiff was being investigated and one of the reasons he was considered a flight risk was because he had "Middle Eastern" ties.

65. Plaintiff was a United States citizen at the time of the investigation and his arraignment who was born in Kuwait and had family in Iran.

66. Detective Steven Stanley contradicted himself during pre-trial hearings and trial. First, he testified during a pre-trial hearing, Plaintiff was unaware items in Mr. Moore's possession were stolen but at trial he falsely stated Plaintiff knew the items were stolen; the detective was trying to shore up the prosecutions' weak case with false testimony.

67. The Manhattan prosecutors and police unjustifiably harassed Plaintiff by examining his immigration records, taxes, credit history, and bank accounts. The police and prosecutors examined the Plaintiff's foreign travel. They also investigated his family members. All of these things

were done to create a criminal case because they knew they had none.

68. The police and prosecutors, without basis, involved the NYPD Counterterrorism Bureau with the investigation. This was done because the Plaintiff had a career in an engineering capacity and was practicing Muslim who was born in the Middle East.

69. The police and prosecutors relied upon religious, ethnic, and nationalist bigotry and slurs as guideposts for their investigation of the Plaintiff (such as the irrational and baseless fear Plaintiff was a terrorist Muslim engineer or chemist) without evidence he assisted in the commission of any burglaries or was a potential terrorist.

70. The police and the NYPD Counterterrorism Bureau followed the Plaintiff for months and recorded his private life without cause using video footage, cell tower reviews of his phone calls and locations, and plate readers all without evidence or extraordinary weak coincidental evidence he was involved with the Manhattan burglaries.

71. Plaintiff was rendered guilty by association because he knew Ricky Moore not because there was evidence he was an accessory to Mr. Moore or a terrorist.

72. Plaintiff was incarcerated for nearly two years because of the false assertions made by the police and prosecutor defendants.

73. He was subjected to disease while incarcerated that resulted in weaking his heart to such an extent he required a heart transplant and intense therapy.

74. Plaintiff never has been able to recover the career and earnings he had before the arrest.

## DAMAGES AND INJURIES:

Plaintiff's damages and injuries include but are not limited to:

a. Wrongful arrest, prosecution, and conviction for burglary;

b. Loss of restrictions on his liberty, including a period of incarceration following his initial arraignment, pre-trial bail restrictions, and after his conviction, nearly two years of incarceration followed by at least a year of parole supervision;

c. Loss of services, society, companionship, and consortium with his wife, daughter, family, and friends;

d. Past and future physical, mental, and emotional injury, illness, and suffering;

e. Fees paid to private criminal defense attorneys of approximately ninety thousand dollars ($90,000.00); and

f. Past and future loss or diminution of employment earnings in an amount to be determined.

### FIRST CAUSE OF ACTION

### 42 U.S.C. §1983

### Denial of Liberty, Due Process of Law, and a Fair Trial Pursuant to the First, Fourth, Fifth, Sixth, and Fourteenth Amendments by Individual Defendants

75. Plaintiff repeats and realleges each allegation contained in paragraphs "1" to "74" of this complaint.

76. Defendants Stanley, Velez, and Unknown "John Doe" members of the New York City Police department individually, acting in concert, and/or aiding and abetting one another deliberately, willfully, recklessly, and/or with deliberate indifference to the truth manufactured false evidence against Plaintiff including that Plaintiff stated he was aware Ricky Moore possessed stolen goods and that Plaintiff knew he was assisting Ricky Moore in the transport of stolen goods.

77. Defendants Stanley, Velez, and Unknown "John Doe" members of the New York City Police department individually, acting in concert, and/or aiding and abetting one another deliberately, willfully, recklessly, and/or with deliberate indifference to the truth caused the aforesaid

false allegations to be conveyed to the prosecutors and the Plaintiff's employer, documented the known false allegations in police reports and other police paperwork, and swore to the truth of the false affidavits and other papers supporting Plaintiff's criminal prosecution during pre-trial and post-trial matters and during pre-trial hearings and at trial.

78.  The false evidence the aforesaid defendants promulgated was material to the Plaintiff's burglary prosecution and Plaintiff's loss of employment in that it was the only evidence of guilt and it reasonably was likely to influence a jury and Plaintiff's former employer.

79.  Defendants Stanley, Velez, and Unknown "John Doe" members of the New York City Police department forwarded, caused to be forwarded, or aided and abetted the forwarding of the false statements attributed to the Plaintiff to the Manhattan prosecutors and Plaintiff's former employer.

80.  Defendants Stanley, Velez, and Unknown "John Doe" members of the New York City Police department knew that the evidence of the burglary they fabricated and caused to be delivered to the Manhattan prosecutors was likely to influence the decision of the prosecutors whether to prosecute the Plaintiff for burglary, influence the court as to what conditions to release the Plaintiff on bail,

impact the decision of the grand jury whether or not to indict the Plaintiff, or impact the decision of the petit jury to convict him of charged crimes.

81. Defendants Stanley, Velez, and Unknown "John Doe" members of the New York City Police department knew that the evidence of the burglary they fabricated and caused to be delivered to Carl Zeiss, the Plaintiff's employer, was likely to influence the decision of Zeiss whether to continue to employ the Plaintiff.

82. In fact, the fabricated evidence was a substantial and proximate cause of Plaintiff's deprivation of liberty and other injuries, including but not limited to Plaintiff's prosecution, detention, release upon restrictive bail conditions, indictment, conviction, imprisonment in state prison, time on parole supervision, and loss of private employment with Carl Zeiss.

83. The prosecution for the burglaries ascribed to Plaintiff as an accessory were favorably terminated for Ricky Moore as the principal.

84. The aforesaid individual defendants are therefore liable to Plaintiff Moalawi pursuant to 42 U.S.C. §§1983 and 1988, for all reasonably foreseeable injuries their unlawful and unconstitutional conduct caused and for Plaintiff's attorney fees, costs, and expenses.

<u>SECOND CAUSE OF ACTION</u>

42 U.S.C. §1983

DENIAL OF EQUAL PROTECTION OF THE LAWS AND DUE PROCESS PURSUANT TO THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND A

CLAIM FOR SELECTIVE PROSECUTION BECAUSE OF RELIGIOUS, ETHNIC, AND NATIONAL ORIGIN BIAS IN VIOLATION OF THE FIRST AND FOURTEENTH

AMENDMENTS TO THE UNITED STATES CONSTITUTION

85.   Plaintiff repeats and realleges each allegation contained in paragraphs "1" to "84" of this complaint.

86.   The Plaintiff was racially profiled.  The investigation and references of the investigation to the Antiterrorism Bureau were the result of national origin and religious bias and ethnic and religious troupes. (the terrorist Muslim engineer).

87.   Plaintiff contends his prosecution was a form of intentional religious and national origin discrimination because for one charge there was no evidence of a crime and for the other the evidence of burglary was so weak it was extraordinary for such a charge to be brought.

88.   In the alternative, Plaintiff contends he was selectively prosecuted by means of non-existent or extraordinarily weak

charges because of unfounded fears that he was a Muslim terrorist because of his engineering skills and religious and national origin.[3]

89. Detective Velez was the detective supervising the burglary investigation involving the Plaintiff and during the course of the investigation he referred to the Plaintiff, in the Plaintiff's presence, as a "camel jockey" and "desert rat."

90. Detective Velez and unknown "John Doe" members of the New York City Police department falsely conveyed to state prosecutors and Plaintiff's employer that the police had evidence the Plaintiff was an accessory with Ricky Moore to burglaries they were investigating because they wanted to deny the Plaintiff a fair trial and cause him to lose his job with Carl Zeiss because the Plaintiff had "Middle Eastern" ties and because Plaintiff was a Muslim born in the Middle East.

91. Defendants Velez and unknown "John Doe" members of the New York City Police department individually, acting in concert, and/or aiding and abetting one another deliberately, willfully, recklessly, and/or with deliberate indifference to the truth acted in a manner contrary to normal and regular police procedures by manufacturing false evidence against Plaintiff when there

---

[3] _Dixon v. City of Syracuse_, 493 F. Supp. 3d 30, 42 (N.D.N.Y. 2020).

was non-existent or insufficient as a matter of law evidence to sustain a burglary charge that Plaintiff acted as an accessory to burglaries with Ricky Moore.

92. The NYPD Terrorism Unit surveilled the Plaintiff for several months, invading his privacy, without evidence he committed any crimes because he was suspect only because of his religion and national origin.

93. Detective Velez acted and directed as supervisor to unknown "John Doe" members of the NYPD the promulgation of known false reports that the Plaintiff was aware Ricky Moore possessed stolen goods and that Plaintiff knew he was assisting Ricky Moore in the transport of stolen goods to the Manhattan prosecutors to initiate a prosecution against the Plaintiff because of religious, ethnic, and national origin hostility and bias against the Plaintiff because he was born in the Middle East and practiced the Muslim faith.

94. The aforesaid misconduct violated the Plaintiff's First and Fourteenth Amendment rights to the federal constitution, denied him a fair trial, led to his unjust incarceration and parole for several years, and cost him his job and a successful career.

95. The aforesaid individual defendants are therefore liable to Plaintiff Moalawi pursuant to 42 U.S.C. §§1983 and 1988, for all reasonably foreseeable injuries their unlawful and

unconstitutional conduct caused and for Plaintiff's attorney fees, costs, and expenses.

### THIRD CAUSE OF ACTION

### 42 U.S.C. §1983

### CLAIM PURSUANT TO *MONELL* AGAINST THE CITY OF NEW YORK FOR *NAPUE* AND *BRADY* VIOLATIONS BY THE NEW YORK COUNTY DISTRICT ATTORNEY

96. Plaintiff repeats and realleges each allegation contained in paragraphs "1" to "95" of this complaint.

97. This is an action to recover compensatory and punitive damages and an award of costs and attorneys' fees for violations of Ali Moalawi's rights secured by 42 U.S.C. §§1983 and 1988 and by the United States Constitution including the First, Fourth, Fifth, Sixth, and Fourteenth Amendments because of the Defendants misconduct and manufacture of known false evidence to prosecute the Plaintiff.

98. The City Defendants encouraged and facilitated the knowing use of false material testimony by Detective Stanley and other unknown "John Doe" police department members and the use of such material by the Manhattan prosecutors. Detective Stanley, Detective Velez, and other unknow John Doe police on their own accord and at the behest of the

NYPD and Manhattan prosecutors, violated the federal constitutional rights of Ali Moalawi.

99. This lawsuit seeks to hold Defendant City of New York liable for the Manhattan prosecutors and their agents, employees, and officials misconduct pursuant to <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978). Plaintiff asserts a <u>Monell</u> claim against the City of New York.

100. A plaintiff may allege municipal liability for federal constitutional violations that occurred pursuant to a "governmental custom, policy, or usage of the municipality."[4]

101. A <u>Monell</u> claim requires Plaintiff to establish three elements: (1) an official policy or custom that; (2) causes Plaintiff to be subjugated to; (3) the denial of a constitutional right.[5]

102. A municipality's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution.

---

[4] <u>Jones v. Town of East Haven</u>, 691 F.3d 72, 80 (2d Cir. 2012).
[5] See <u>O'Hara v. City of New York</u>, 2019 U.S. Dist. LEXIS 91551 *25-27 (E.D.N.Y. 2019).

103. Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under 42 U.S.C. §1983.[6]

104. A claim of deliberate indifference also may be framed as a claim regarding the municipal defendant's failure to train, supervise, and discipline its employees. Plaintiff alleges the Manhattan prosecutors training and discipline policies and practices were consciously designed to permit and encourage violations of the federal constitution and the holdings of the United States Supreme Court cases of *Brady* and *Napue*.[7]

105. To assert municipal liability based on a failure to train, "the plaintiff must show: [1] that a policymaker knows "to a moral certainty" that their employees will confront a given situation; [2] that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and [3] that the wrong choice by the city employee will

---

[6] <u>Collins v. City of New York</u>, 923 F. Supp.2d 462, 476 (E.D.N.Y. 2013).
[7] <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963); <u>Napue v. Illinois</u>, 360 U.S. 264, 269-272 (1959).

frequently    cause    the    deprivation    of    a    citizen's
constitutional rights.[8]

106. Multiple federal district courts in the State of New York
within the past few years have ruled that the City of New
York may be held liable pursuant to Monell for local
prosecutor practices that include the knowing use of
fabricated and perjured testimony and the withholding of
exculpatory evidence favorable to the accused in criminal
proceedings as similarly alleged in this case.[9] The cited
cases indicate that the use of fabricated and perjured
testimony by local prosecutors is a recurring problem that
envelops the time period of Plaintiff's criminal case.

107. Prior to Plaintiff's trial, policymaking officials of the
City    defendants,    in    coordination    with    Manhattan
prosecutors, due to their deliberate indifference to the
*Napue* and *Brady* rights of criminal defendants, implemented
inadequate policies, procedures, regulations, practices,
customs, training, supervision, and discipline concerning
the duty of police officers and local prosecutors to make
accurate and timely disclosures of material evidence or

---

[8] Davis v. City of New York, 2017 U.S. Dist. LEXIS 143678 **12, 13 (E.D.N.Y. 2017).
[9] Bellamy v. City of New York, 914 F.3d 727, 756-761 (2d Cir. 2019);  Buari v. City of
New York, 530 F.Supp.3d 356, O'Hara v. City of New York, 2019 U.S. Dist. LEXIS 91551,
**25-27 (E.D.N.Y. 2019); Fraser v. City of New York, 2021 U.S. Dist. LEXIS 69324,
**25-26.(SDNY 2021); Collins v. City of New York, 923 F. Supp.2d 462, 476-478
(E.D.N.Y. 2013); Davis v. City of New York, 2017 U.S. Dist. LEXIS 143678 **22-28
(E.D.N.Y. 2015); Bailey v. City of New York, 79 F. Supp.3d 424, 441-443 (E.D.N.Y.
2015); Walker v. City of New York, 974 F.2d 293, 300 (2nd Cir. 1992); Newson v. City of
New York, 2019 U.S. Dist. LEXIS 143835 (EDNY 2019); see also Galgano v. County of
Putnam, 2020 U.S. Dist. LEXIS 116682 (SDNY 2020).

information favorable to criminal defendants, including evidence or information impeaching the credibility of prosecution witnesses, including police officers themselves.

108. This type of disclosure was necessary so that local prosecutors could ensure the integrity of the criminal process in accord with *Napue* and to determine whether to provide such information to criminal defendants and their counsel consistent with the People's obligations pursuant to *Brady*.

109. As the cited cases indicate policy making officials at the local prosecutors' offices knew that members of the police force often acted as essential witnesses in criminal proceedings and that many of them face or have faced lawsuits alleging NYPD members have engaged in various types of misconduct, including fabricating evidence, stealing, a variety of acts of dishonesty, and making arrests without probable cause.[10]

---

[10] Bellamy v. City of New York, 914 F.3d 727, 756-761 (2d Cir. 2019); Buari v. City of New York, 530 F.Supp.3d 356, O'Hara v. City of New York, 2019 U.S. Dist. LEXIS 91551, **25-27 (E.D.N.Y. 2019); Fraser v. City of New York, 2021 U.S. Dist. LEXIS 69324, **25-26.(SDNY 2021); Collins v. City of New York, 923 F. Supp.2d 462, 476-478 (E.D.N.Y. 2013); Davis v. City of New York, 2017 U.S. Dist. LEXIS 143678 **22-28 (E.D.N.Y. 2017); Bailey v. City of New York, 79 F. Supp.3d 424, 441-443 (E.D.N.Y. 2015); Walker v. City of New York, 974 F.2d 293, 300 (2nd Cir. 1992); Newson v. City of New York, 2019 U.S. Dist. LEXIS 143835 (EDNY 2019); see also Galgano v. County of Putnam, 2020 U.S. Dist. LEXIS 116682 (SDNY 2020).

115. New York City has endorsed, by means of deliberate indifference, the Manhattan prosecutors' bigoted profiling of the Plaintiff because of the bigoted, irrational, and unsubstantiated belief that he was a Muslim terrorist with an engineering background.

116. The Manhattan prosecutors with their agents, employees, and officials maintained unlawful and bigoted policies, practices, and customs during Ali Moalawi's investigation, arrest, pre-trial proceedings, and trial. In executing these unlawful and bigoted policies, practices, and customs the NYPD and the Manhattan prosecutors their agents, employees, and officials violated the constitutional rights of criminal suspects and defendants, including Ali Moalawi.

117. In the Plaintiff's case, the unlawful policies, practices, and customs enabled Detective Stanley, Detective Velez, as well as other members, servants, employees, and agents of the NYPD, to violate the Plaintiff's federal constitutional rights. The policy-making officials acting on behalf of the City of New York were deliberately indifferent to religious and ethnically discriminatory policies and unlawful policies, practices, and customs. As a result, the City of New York is liable for Ali Moalawi's injuries.

118. All of the acts by the police defendants described above were carried out pursuant to policies and practices of the City of New York which were in existence at the time of

the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant City and its agency, the New York County prosecutor.

119. The Plaintiff, Ali Moalawi, applies to this court to seek all of the relief he is entitled to under law.

## DAMAGES DEMAND

**WHEREFORE,** Plaintiff demands judgment against the Defendants as follows:

a. For compensatory damages of not less than seven million dollars;
b. For punitive damages of not less than three million dollars;
c. For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. §1988 and to the inherit powers of this Court;
d. For pre-judgment interest as allowed by law; and
e. For all such other and further relief as this Court may deem just and proper.

July 21, 2024

Ali Moalawi
*Pro Se Plaintiff*
6 Dawson Place
Huntington, NY 11746

33

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

|  |  |  |
|---|---|---|
| _____ ALI MOALAWI _____ | ) ) ) ) ) | |
| *Plaintiff(s)* | ) ) | Civil Action No. |
| v. | ) | |
| The City of New York, Individually And As Detective Steven Stanley, a member of the NYPD Detective Albert Velez, Individually And Joe Doe Members of NYPD, as member of the Individually And As member of NYPD, NYPD | ) ) ) ) ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   New York City, Detective Steven Stanley, Detective Albert Velez, John Doe Member of NYPD
By New York City Department of Law
100 Church Street
New York, NY 10007

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                    _____
                                          *Signature of Clerk or Deputy Clerk*

JS 44C/SDNY
REV.
05/28/2024

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

PLAINTIFFS  Ali MoAlAwI
6 DAwson Place
Huntington, NY 11746

DEFENDANTS

ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Pro Se Ali MoAlAwI
929 444-0321

ATTORNEYS (IF KNOWN)

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Denial of FAIR TriAl becaue of false police Testimony/
42 usc §1983   Monell claim AgAinst city for Deliberate Indifferenc

Has this action, case, or proceeding, or one essentially the same, been previously filed in SDNY at any time? No[ ] Yes[X]  Hon. Ronnie ABrAM
(if yes, Judge Previously Assigned)

If yes, was this case Vol.[ ] Invol.[X] Dismissed. No[ ] Yes[X]  If yes, give date  4/9/21  & Case No.  22 CV 6770

**Is THIS AN INTERNATIONAL ARBITRATION CASE?**    No[X]    Yes[ ]

*(PLACE AN [x] IN ONE BOX ONLY)*    **NATURE OF SUIT**

|  |  |  |  |
|---|---|---|---|
| | | ACTIONS UNDER STATUTES | |

**TORTS**

**CONTRACT**
[ ] 110 INSURANCE
[ ] 120 MARINE
[ ] 130 MILLER ACT
[ ] 140 NEGOTIABLE INSTRUMENT
[ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151 MEDICARE ACT
[ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS
[ ] 160 STOCKHOLDERS SUITS
[ ] 190 OTHER CONTRACT
[ ] 195 CONTRACT PRODUCT LIABILITY
[ ] 196 FRANCHISE

**PERSONAL INJURY**
[ ] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360 OTHER PERSONAL INJURY
[ ] 362 PERSONAL INJURY - MED MALPRACTICE

**PERSONAL INJURY**
[ ] 367 HEALTHCARE/ PHARMACEUTICAL PERSONAL INJURY/PRODUCT LIABILITY
[ ] 365 PERSONAL INJURY PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**
[ ] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING

[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**PRISONER PETITIONS**
[ ] 463 ALIEN DETAINEE
[ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER

**FORFEITURE/PENALTY**
[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 690 OTHER

**PROPERTY RIGHTS**
[ ] 820 COPYRIGHTS
[ ] 830 PATENT
[ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATION
[ ] 840 TRADEMARK

**LABOR**
[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 740 RAILWAY LABOR ACT
[ ] 751 FAMILY MEDICAL LEAVE ACT (FMLA)
[ ] 790 OTHER LABOR LITIGATION
[ ] 791 EMPL RET INC SECURITY ACT (ERISA)

**BANKRUPTCY**
[ ] 422 APPEAL 28 USC 158
[ ] 423 WITHDRAWAL 28 USC 157

**SOCIAL SECURITY**
[ ] 861 HIA (1395ff)
[ ] 862 BLACK LUNG (923)
[ ] 863 DIWC/DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
[ ] 870 TAXES (U.S. Plaintiff or Defendant)
[ ] 871 IRS-THIRD PARTY 26 USC 7609

[ ] 880 DEFEND TRADE SECRETS ACT

**OTHER STATUTES**
[ ] 375 FALSE CLAIMS
[ ] 376 QUI TAM
[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLU-ENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480 CONSUMER CREDIT
[ ] 485 TELEPHONE CONSUMER PROTECTION ACT
[ ] 490 CABLE/SATELLITE TV
[ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE
[ ] 890 OTHER STATUTORY ACTIONS
[ ] 891 AGRICULTURAL ACTS
[ ] 893 ENVIRONMENTAL MATTERS
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 896 ARBITRATION
[ ] 899 ADMINISTRATIVE PROCEDURE ACT/REVIEW OR APPEAL OF AGENCY DECISION
[ ] 950 CONSTITUTIONALITY OF STATE STATUTES

**REAL PROPERTY**
[ ] 210 LAND CONDEMNATION
[ ] 220 FORECLOSURE
[ ] 230 RENT LEASE & EJECTMENT
[ ] 240 TORTS TO LAND
[ ] 245 TORT PRODUCT LIABILITY
[ ] 290 ALL OTHER REAL PROPERTY

**ACTIONS UNDER STATUTES**

**CIVIL RIGHTS**
[X] 440 OTHER CIVIL RIGHTS (Non-Prisoner)
[ ] 441 VOTING
[ ] 442 EMPLOYMENT
[ ] 443 HOUSING/ ACCOMMODATIONS
[ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
[ ] 446 AMERICANS WITH DISABILITIES -OTHER
[ ] 448 EDUCATION

**PRISONER CIVIL RIGHTS**
[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION
[ ] 560 CIVIL DETAINEE CONDITIONS OF CONFINEMENT

**IMMIGRATION**
[ ] 462 NATURALIZATION APPLICATION
[ ] 465 OTHER IMMIGRATION ACTIONS

Check if demanded in complaint:

[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $_____ OTHER _____

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y. AS DEFINED BY LOCAL RULE FOR DIVISION OF BUSINESS 13?
IF SO, STATE:

JUDGE _____  DOCKET NUMBER_____

*Check YES only if demanded in complaint*
JURY DEMAND: [YES]  NO
Yes

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

*(PLACE AN x IN ONE BOX ONLY)*

**ORIGIN**

[X] 1 Original Proceeding  [ ] 2 Removed from State Court  [ ] 3 Remanded from Appellate Court  [ ] 4 Reinstated or Reopened  [ ] 5 Transferred from (Specify District)  [ ] 6 Multidistrict Litigation (Transferred)  [ ] 7 Appeal to District Judge from Magistrate Judge

[ ] a. all parties represented

[ ] b. At least one party is pro se.

[ ] 8 Multidistrict Litigation (Direct File)

*(PLACE AN x IN ONE BOX ONLY)*   **BASIS OF JURISDICTION**   *IF DIVERSITY, INDICATE CITIZENSHIP BELOW.*

[ ] 1 U.S. PLAINTIFF   [ ] 2 U.S. DEFENDANT   [X] 3 FEDERAL QUESTION (U.S. NOT A PARTY)   [ ] 4 DIVERSITY

**CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)**

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Ali Moalawi
6 Dawson Place
Huntington, NY 11746
Suffolk County, NY

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

City of New York
Detective Steven Stanley
Detective Albert Velez

Unknown "John Doe" Police
Address: Dept of Law, New York City
100 Church Street
NY NY 10007

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Plaintiff Does not know Addresses of Detectives
But has cited NYC Department of Law As their
Address.

**COURTHOUSE ASSIGNMENT**

I have reviewed Rules 18(a) and 20(a) of the Rules for the Division of Business Among District Judges, Southern District of New York, and I hereby certify that this case should be assigned to the courthouse indicated below pursuant thereto.

Check one:   THIS ACTION SHOULD BE ASSIGNED TO:   [ ] WHITE PLAINS   [X] MANHATTAN

DATE 7/21/24

SIGNATURE OF ATTORNEY OF RECORD

RECEIPT #

ADMITTED TO PRACTICE IN THIS DISTRICT
[X] NO
[ ] YES (DATE ADMITTED Mo. _____ Yr. _____)
Attorney Bar Code #

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Daniel Ortiz, Acting Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

Clear Form      Save      Print

A. MotlAwI
6 DAwSoN PLAce
HunTington, NY 11746

Clerk
Southern DisTrict of
New York
500 Pearl STreet
New York, NY 10013

RECEIVED
JUL 23 2024



USMP3
SDNY

PRO SE CLR
7/24/24